UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| WILLIAM COX, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CAUSE NO. 3:12-CV-320 PS |
| vs. ) | |
| ) | |
| MARTIN LEVENHAGEN, *et al.*, ) | |
| ) | |
| Defendants. ) | |

OPINION AND ORDER

William Cox claims that the medical staff at Westville Correctional Facility provided him with inadequate medical care, including prescribing a pain medication that caused him dental problems as a side effect. (DE 13.) The defendants – Nurse Practitioner Barbara Brubaker, Dr. Kevin Krembs, and Dr. Andrew Liaw – all seek summary judgment (DE 82). Because there is no evidence to suggest that any of the defendants were deliberately indifferent to Cox's serious medical needs, the defendants' motion for summary judgment will be granted.

**Factual Background**

The following facts are undisputed, and while stating them can be a bit tedious, it is necessary to give a full flavor for the breadth of the care that Cox has received while in custody. Cox is 60 years old and weighs approximately 230 pounds. (DE 85-3, Liaw Aff. ¶ 2.) He has been housed at Westville during all relevant events, and is enrolled in the chronic care clinic, which means he is seen by a health care provider at least every 12 weeks. (DE 85-4, Brubaker Aff. ¶ 3.)

On September 11, 2011, Cox submitted a health care request stating that he was having stomach problems and had been regurgitating his food. (DE 85-5 at 1.) He was seen by a nurse at

sick call the following day, and was placed on the list to see a medical provider. (*Id.*) On September 19, 2011, Cox was seen by Brubaker, a licensed nurse practitioner in the State of Indiana, who has been working at Westville for the past eight years. (DE 85-4, Brubaker Aff. ¶ 2.) Cox told Brubaker he had a history of gastric ulcers and had difficulty eating meat. (DE 85-5 at 2.) He also complained of left ankle pain when "pushing off." (*Id.* at 3.) Brubaker noted that Cox was overweight, and she counseled him on lifestyle modification for exercise, a healthy diet, and weight. (*Id.*) She also noted from her examination that he had several teeth missing. (*Id.*) She prescribed Zantac and a soft diet for 90 days for acid reflux. (*Id.*) For his ankle problem, she wrote him a 6-week bottom bunk pass, ordered him an ankle brace (which he received on September 22, 2011), and prescribed a drug called Pamelor. (*Id.* at 3, 5.)

Pamelor is in a class of drugs called tricyclic antidepressants, or TCAs, and is commonly used "off-label" as a treatment for pain. (DE 85-4, Brubaker Aff. ¶ 4.) "Off-label" means that the FDA has not approved the drug for that particular use, even though it may be commonly prescribed by doctors for that purpose. (*Id.*) Doctors in private practice routinely prescribe Pamelor to treat all types of chronic pain. (*Id.*; DE 85-2, Krembs Aff. ¶ 5; DE 85-3, Liaw Aff. ¶ 3.) Pamelor comes in doses of 10, 25, 50, or 75 milligrams. (DE 85-4, Brubaker Aff. ¶ 4.) Brubaker prescribed Cox 10 milligrams per day, the lowest dose. (*Id.*) The most commonly reported side effects of Pamelor are rapid heart beat, blurred vision, urinary retention, dry mouth, constipation, weight fluctuations, and low blood pressure. (*Id.* ¶ 6.) When Brubaker prescribes a medication, she does not typically talk to patients about all the potential side effects, because in most cases they do not materialize, and she does not want to cause them unnecessary worry. (*Id.*)

She does ordinarily tell patients who are prescribed Pamelor to expect drowsiness for the first few weeks. (*Id.*)

On September 26, 2011, Cox submitted another health care requesting stating that his knee hurt. (DE 85-5 at 6.) He also complained that his bottom bunk pass had not arrived in the mail, and he had not received his pain medication. (*Id.*) On September 29, 2011, a nurse issued him a duplicate bottom bunk pass and informed him that his medication was at the medication window daily at the last medication call. (*Id.*) On October 14, 2011, Cox submitted a health care request stating that his knee "pops like popcorn" whenever he bent it and complaining that the pain medication "has no effect whatsoever." (*Id.* at 7.) He requested a brace for his knee. (*Id.*) On October 18, 2011, a nurse responded that a knee brace had been ordered and that he had been referred to the doctor. (*Id.*)

On October 24, 2011, Cox was seen by Dr. Krembs, a physician licensed to practice in Indiana who has been working at Westville for several years. (DE 85-2, Krembs Aff. ¶ 2.) Dr. Krembs noted that Cox reported having knee pain for approximately three months, as well as joint instability, popping, and weakness. (DE 85-5 at 8.) Dr. Krembs' professional opinion was that Cox's knee pain was the result of osteoarthritis, or degenerative changes that occur naturally with age. (DE 85-2, Krembs Aff. ¶ 4.) He ordered Cox a knee brace and scheduled him for a steroid injection, which is a common treatment for osteoarthritis pain. (*Id.*) Cox received his knee brace on October 28, 2011. (DE 85-5 at 10.)

On December 31, 2011, Cox submitted a health care request complaining of a toothache, swollen gums, and an earache. (DE 85-5 at 11.) He was prescribed penicillin and Tylenol. (*Id.* at 11-12.) On January 6, 2012, Dr. Liaw saw Cox for his chronic care visit. (DE 85-5 at 13-15.)

Cox reported that his acid reflux was stable. (*Id.* at 13.) He was wearing braces on his right knee and left ankle, and requested a brace for his left knee, stating that it had been "giv[ing] out." (*Id.*) He also reported that his pain was not well-controlled on Pamelor. (*Id.*) He did not complain to Dr. Liaw of any side effects of his medication. (DE 85-3, Liaw Aff. ¶ 5.) Dr. Liaw ordered him another knee brace, and increased the dosage of Pamelor to 25 milligrams to see if that would alleviate his pain. (*Id.*) In Dr. Liaw's medical opinion, Cox's issues with toothache, swollen gums and earache were dental problems and not side effects of Pamelor. (DE 85-3, Liaw Aff. ¶ 4.)

On February 5, 2012, Cox submitted a health care request complaining that his bottom bunk pass had expired. (DE 85-5 at 16.) He also claimed that he had reinjured his right knee climbing out of the bunk, and that he was still in a lot of pain. (*Id.*) On February 8, 2012, a nurse responded that Cox had been given a temporary bottom bunk pass but did not meet the criteria for the nurses to write him another pass. (*Id.*) He was advised that the doctor had to approve such a request. (*Id.*) On February 9, 2012, Cox was seen by a nurse at sick call. (*Id.* at 17-18.) The nurse's notes reflect that Cox "did not like the answer on his sick call form that he did not qualify for a [bottom bunk pass]" and was "[v]ery defensive and verbal[.]" (DE 85-5 at 18.) The nurse conferred with Dr. Liaw, who confirmed that Cox did not meet the criteria for a bottom bunk pass. (*Id.*) According to the nurse's notes, Cox responded, "[F]ine, I'll just sleep on the floor," and walked out. (*Id.*) On February 12, 2012, Cox refused to take his Pamelor. (DE 85-5 at 20.) He was later called to the medical unit to sign a waiver form, but then stated he would take the medication after all. (*Id.*) Cox has a right to refuse his medication if he chooses. (DE 85-2, Krembs Aff. ¶ 5; DE 85-3, Liaw Aff. ¶ 3; DE 85-4, Brubaker Aff. ¶ 5.)

4

On February 20, 2012, Cox was seen again by Dr. Liaw. (DE 85-6 at 3.) He reported that he had just turned 60 and wanted a bottom bunk pass due to pain in both knees and his left ankle. (*Id.*) He reported having difficulty swinging his legs over the top step in order to get into the top bunk. (*Id.*) Dr. Liaw noted that Cox was overweight, and suggested that his best option was weight loss. (DE 85-3, Liaw Aff. ¶ 7.) He informed Cox that he did not meet the requirements for a bottom bunk pass. (*Id.*)

On February 21, 2012, Cox was scheduled to receive a steroid injection, but he opted to refuse this treatment. (DE 85-6 at 7.) He signed a medical waiver form, stating as follows:

> I have already had three injections in my life for the same reason and the pain only stayed away for about a week! My knee is never going to be right again it was originally damaged while in the Marine Corp over 40 years ago. It's been this way since. I really just don't need to run or aggravate it and then I'm actually fine no climbing jumping or running!

(*Id.*) Cox was instructed by the nurse that if he changed his mind he should submit a health care request. (*Id.*)

On March 15, 2012, Cox submitted a health care request stating that he had a toothache, an earache, and was having trouble swallowing. (DE 85-6 at 2.) He was seen by a nurse on March 17, 2012. (*Id.*) Upon examining his teeth, the nurse noted as follows: "right side of upper teeth eroded exposed, has swelling which goes up and down." (*Id.* at 9.) She also noted that he had broken teeth and the overall condition of his teeth was poor. (*Id.*) Cox advised her that he had seen a dentist and was going to have a tooth pulled but had not done so yet. (*Id.*) The nurse contacted Dr. Krembs, who prescribed an antibiotic along with Naproxen, an anti-inflammatory medication, for pain. (*Id.* at 12; DE 85-2, Krembs Aff. ¶ 6.) The nurse instructed Cox to keep his

5

teeth and gums clean, and to contact medical staff if the symptoms did not subside or got worse. (DE 85-6 at 9.)

On March 29, 2012, Cox was seen by Brubaker for his chronic care visit. (*Id.* at 14-16.) He reported that his acid reflux was asymptomatic with his medication. (*Id.*) He further reported that he had stopped taking Pamelor because it made him feel "high" and did not help his pain. (*Id.* at 14.) He stated that he had a recent increase in pain due to twisting his right knee and straining his left ankle but reported that the Naproxen was helping. (*Id.*) Brubaker ordered an x-ray of his left ankle and right knee and issued him a temporary bottom bunk pass. (*Id.* at 16.) She also discontinued the Pamelor. (*Id.*)

On April 5, 2012, Cox underwent x-rays of his knee and ankle. (DE 85-6 at 17.) The x-ray of his ankle revealed a calcaneal spur and a tiny calcification adjacent to the tip of the lateral malleolus, which the radiologist opined was "probably related to old trauma or could represent a very minimal avulsion fracture." (*Id.*) The x-ray of his ankle was otherwise unremarkable, and the x-ray of his knee showed no abnormalities. (*Id.*) On April 10, 2012, Dr. Liaw saw Cox to discuss the results of the x-rays. (DE 85-6 at 19-20.) According to Dr. Liaw's notes, Cox was "unhappy with the results" and stated that he still wanted a bottom bunk pass. (*Id.*) He insisted that his knee and ankle were not normal. (*Id.*) Dr. Liaw noted that Cox was able to ambulate between the waiting room and the office "with a slight limp but otherwise normal." (*Id.*) In Dr. Liaw's view, knee and ankle pain is not uncommon for someone of Cox's age and weight. (DE 85-3, Liaw Aff. ¶ 10.) The doctor recommended a shoe insert for the calcaneal spur, but in his opinion no further treatment was warranted other than medication to manage Cox's pain. (*Id.* ¶ 8.)

On August 2, 2012, Cox was seen by Brubaker for his chronic care visit. (DE 85-7 at 2-4.) According to her notes, Cox reported that the Naproxen was helping with his knee and ankle pain. (*Id.*) He further reported that his acid reflux had subsided and he no longer needed medication. (*Id.*) He was seen again by Brubaker on October 30, 2012, for his chronic care visit. (*Id.* at 7.) According to her notes, he reported that he was taking the medication for arthritis pain only when needed and without any problems. (*Id.*)

## Discussion

Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability, a prisoner must show that: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to that medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

The deliberate indifference prong sets a steep course for a plaintiff to climb; he must show that the defendant "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005). Deliberate indifference requires a showing of a complete departure from accepted professional judgment, practice, or standards. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008)*; see also Holloway v. Delaware County Sheriff,* 700 F.3d 1063, 1074 (7th Cir. 2012). Proof of medical malpractice is not enough because "the

7

Eighth Amendment does not codify common law torts." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

When an inmate receives some form of medical treatment, to establish deliberate indifference he must show that the treatment was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Id.* What's more, although prisoners are entitled to a minimum level of adequate care, they are not entitled to demand specific medical treatment, nor are they entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *see also Maggert v. Hanks*, 131 F.3d 670, 671-72 (7th Cir. 1997).

Applying these stringent principles here, it is apparent that although Cox's arthritis constitutes a serious medical need for purposes of the Eighth Amendment, *see Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013), he fails on the second prong because the treatment he received was adequate and reasonable. The record reflects he was evaluated several times by medical staff, underwent diagnostic testing, was given knee and ankle braces, was prescribed medication to alleviate his pain, and was monitored by medical staff.[1] He was offered a steroid injection but refused this treatment, indicating that his knee problem had been ongoing for decades. The opinion of Cox's treating physician is that he has osteoarthritis, a problem not uncommon for someone of his age and weight, and that other than pain medication, no additional testing or treatment is needed. (DE 85-3, Liaw Aff. ¶ 10.)

---

[1] Cox mentions in passing that he never received the left knee brace Dr. Liaw ordered for him in January 2012. (DE 88-2 at 8.) Unlike Dr. Liaw, Cox does not make this statement in a sworn affidavit, but in any event, there is nothing to suggest he alerted Dr. Liaw about failing to receive the brace that was ordered, even though he had numerous appointments after this and submitted written health care requests on other issues. (*See* DE 85-5 at 16; DE 85-6 at 2.) At most he has shown inadvertence by medical staff, which would not give rise to a constitutional violation. *Arnett*, 658 F.3d at 751.

It is clear from Cox's filings that he disagrees with the defendants' treatment decisions, but his mere disagreement with medical professionals over the proper course of treatment does not establish deliberate indifference. *Arnett*, 658 F.3d at 751; *see also Ray*, 706 F.3d at 866 (prisoner with arthritis failed to establish deliberate indifference where he was under the care of doctors, underwent x-rays, and received pain medication, even though the inmate was "sure . . . physicians could do better" with additional diagnostic testing); *Norfleet*, 439 F.3d at 395-96 (same). If Cox were a free person and could afford to do so, he might decide to see a specialist or try the alternative treatments he mentions (such as heat treatments or physical therapy), but the Eighth Amendment does not entitle him to demand such care. *See Maggert*, 131 F.3d 671-72; *Forbes*, 112 F.3d at 267.

Cox argues at length that the defendants violated IDOC policies and other state laws when they prescribed him Pamelor. (DE 88-2; DE 90, 96.) Even if the defendants did violate IDOC policies, this alone would not create liability under 42 U.S.C. § 1983. *See Sobitan v. Glud*, 589 F.3d 379, 389 (7th Cir. 2009) ("By definition, federal law, not state law, provides the source of liability for a claim alleging the deprivation of a federal constitutional right.") (internal citation omitted). To the extent Cox is trying to separately assert a malpractice claim under state law, I did not discern any state law claims in his complaint, nor did I grant him leave to proceed on any such claims. (*See* DE 13.) Nor can he amend his complaint to add claims at this late stage. *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). In any event, there is no indication he complied with the necessary procedural requirements for pursuing a malpractice claim under Indiana law. *See* IND. CODE § 34-18-8-4.

9

Relatedly, Cox argues that the defendants were deliberately indifferent because they gave him Pamelor for an "off-label" purpose. (DE 90.) This argument is also unavailing. Federal law prohibits drug manufacturers from marketing a drug for an off-label purpose, but it does not preclude medical professionals from prescribing a drug for uses that are different than those approved by the FDA. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001). Instead, "[t]he decision to prescribe such 'off-label usage,' as it is called, is deemed a professional judgment for the healthcare provider to make." *Nightingale Home Healthcare, Inc., v. Anodyne Therapy, LLC*, 626 F.3d 958, 965 (7th Cir. 2010). Thus, the fact that Cox was prescribed Pamelor for pain does not establish deliberate indifference, or even medical malpractice for that matter. To the extent Cox is arguing that Brubaker did not have authority to prescribe him *any* drugs since she is not a physician, this is incorrect, since licensed nurse practitioners can prescribe medications under Indiana law. *See* 848 IND. ADMIN. CODE § 5-1-1.

Cox further argues that he should not have been prescribed Pamelor because he was taking Zantac for acid reflux, pointing to information he appears to have obtained from a medical publication.[2] (*See* DE 88-4 at 38-43.) However, this publication does not state that the two medications should never be taken together, only that patients should speak with their doctor about all their medications because interactions can occur. (*Id.* at 39.) The defendants offer uncontradicted testimony that they are unaware of any contraindication for prescribing Pamelor with Zantac. (DE 85-3, Liaw Aff. ¶ 3; DE 85-4, Brubaker Aff. ¶ 5s.)

---

[2] The defendants argue that this material has not been properly authenticated, but I will presume the material (which appears to be from the *Physician's Desk Reference* or a similar publication) could be submitted in some admissible form if the case were to proceed to trial. *See* FED. R. CIV. P. 56(c); FED. R. EVID. 803(18).

In a similar vein, Cox argues that he should have been more carefully monitored while he was taking Pamelor, again citing to information he obtained from a medical publication. (*See* DE 88-4 at 2-43.) However, the information he points to discusses the need to monitor patients when they begin taking Pamelor for depression, to ensure that they do not pose a risk of suicide. (*See id.* at 2, 5-6.) Cox was not taking Pamelor for depression, so this caveat is inapplicable. Moreover, the record shows that medical staff did monitor Cox while he was taking Pamelor. He was seen by medical staff at regularly scheduled visits, and he was clearly aware of the procedure for notifying staff if he had a medical problem in between visits, since he submitted numerous written requests during this period. None of these documents reflect that he alerted medical staff he was experiencing significant adverse side effects from Pamelor. He attributes his dental problems to the Pamelor, but his medical records reflect that he had problems with his teeth well before he started taking the medication (DE 85-5 at 2), and Cox's treating physician does not believe this problem had any connection to the medication. (DE 85-3, Liaw Aff. ¶ 4.)

Cox cites to information from a medical journal indicating that Pamelor can cause dry mouth, which, as he points out, could have conceivably exacerbated his gum problems. (*See* DE 88-4 at 34) ("Continuing dryness of the mouth may increase the chance of dental disease, including tooth decay, gum disease, and fungus infections."). However, potential side effects – even those that may be unpleasant – are a routine part of taking any medication. Cox has not established that the defendants knew there was a significant risk he would suffer severe side effects from Pamelor and disregarded that risk, which is necessary to establish deliberate indifference. Instead the record shows that in most cases Pamelor carries a risk of minor side effects, the bulk of which Cox did not experience. (DE 85-3, Liaw Aff. ¶ 3; DE 85-4, Brubaker

11

Aff. ¶ 4.) Even if Cox's dental problems were caused or exacerbated by the Pamelor, they were not left untreated. Instead, the record reflects that when he complained about this problem he was promptly evaluated and provided with medication which, as far as the record reveals, alleviated the infection.[3]

Furthermore, if Cox believed Pamelor was having serious ill effects on his health, the evidence before me is that he could have refused to take it. In fact he did refuse to take it on one occasion, but then changed his mind. Ultimately he stopped taking it altogether, telling Brubaker he did not like the way it made him feel, at which point she stopped prescribing it. It does appear that Cox continued to experience pain while he was taking Pamelor, which is unfortunate. But the defendants did not simply ignore his complaints of pain or continue with a course of treatment known to be ineffective. *Compare Greeno*, 414 F.3d at 654. Instead they promptly responded to his written complaints, adjusted the dosage of his medication, and then prescribed a different medication, which he reported to them was working to alleviate his pain. Based on the record, Cox has not established that the care provided by the defendants was "so blatantly inappropriate" as to evidence intentional mistreatment of his condition. *Arnett*, 658 F.3d at 751. No reasonable jury could find them liable for a constitutional violation, and accordingly, they are entitled to summary judgment.

In closing, I note that as of the date of this order, Cox has filed seven different documents responding to the defendants' motion for summary judgment. (DE 88, 90, 92, 93, 95, 96, 97.)

---

[3] Cox makes assertions that Pamelor caused him nightmares and interfered with his ability to think clearly, relying on statements he made in his complaint. (*See* DE 88, 90, 92.) He cannot rely on his pleadings at this stage. *Goodman*, 621 F.3d at 654. Furthermore, he does not assert any long-term injury, only some unpleasant temporary side effects that went away when he stopped taking Pamelor. There is also nothing in the record to reflect that he brought these alleged symptoms to the attention of the defendants, until he told Brubaker that the drug made him feel "high," at which point she stopped prescribing it. (*See* DE 85-6 at 14-16.)

Although this is not procedurally proper and has created unnecessary confusion for both me and the defendants, given his *pro se* status I have considered all of these filings in ruling on the motion. The defendants object to one of his filings (DE 90) as an improper and untimely motion for summary judgment. However, as I read this document as well as his later filings, he was simply trying to reiterate the reasons why he believes judgment should not be entered in favor of the defendants and the case should proceed to trial. (DE 90, 95, 96, 97.) To the extent he is requesting summary judgment in his favor, his filing is not in compliance with FEDERAL RULE OF CIVIL PROCEDURE 56(c) or N.D. LOCAL RULE 56-1. Substantively the motion would fail for the reasons articulated above regarding the lack of evidence showing deliberate indifference by the defendants.

For these reasons, the defendants' motion for summary judgment (DE 82) is **GRANTED**. The plaintiff's dispositive motion (DE 90) is **DENIED.** The Clerk is **DIRECTED** to enter judgment in favor of the defendants.

**SO ORDERED**.

ENTERED: July 1, 2013.   /s/ Philip P. Simon
Philip P. Simon, Chief Judge
United States District Court